## Tomlinson v. Tomlinson

*Craig & Blass*, for petitioner.
*Harold F. Mook*, for respondent.

WAITE, P. J., March 30, 1937.—This is a proceeding for annulment of a marriage. Petitioner alleges fraud and coercion on the part of respondent in misrepresenting her age and in representing that she had never been married and divorced. The parties were residents of New York State, and on January 12, 1922, came to Erie, Pa., where an application was made and a marriage license issued to Oliver Tomlinson and Bertha Hoffman, respondent's maiden name, and the ceremony performed in Erie on the same day.

The testimony shows that respondent had been married before and divorced in New York State under the name of Bertha Wendt. The decree of divorce, a copy of which

was offered in evidence, was dated October 4, 1918, and provided, inter alia:

"It shall be unlawful for the said Bertha Wendt to marry again until the said plaintiff [Charles Wendt] is actually dead."

The evidence further shows that Charles Wendt is still living.

Respondent had a daughter, Florence Wendt, by the former marriage, who was living with her at the time of her courtship by and marriage to petitioner. This daughter continued to reside with petitioner and respondent and always called respondent "Ma", as admitted by petitioner, who also admitted that he took out a policy of insurance in which the daughter was named as beneficiary. Other witnesses testified that the daughter always called respondent "mother". Mrs. Zahn, a witness for respondent, testified that shortly before the parties were married petitioner said to the daughter in the witness' home, "Florence, I love your mother. I would never have any harm come to your mother". The daughter further testified that at the time of her marriage in August 1928 she introduced petitioner to her father. Petitioner denies that he knew respondent had been married before or that Florence Wendt was her daughter. He further testified that, sometime in 1933, he first learned that respondent had been married before and divorced when he found a copy of the decree of divorce among her papers. On cross-examination he admitted that he continued to live with respondent until May 1934.

A certified copy of the decree of divorce in New York State, offered in evidence, does not show upon what ground the decree was granted. In cross-examination respondent testified that the only ground upon which a divorce can be granted in New York State is adultery, but further testified that she never committed adultery. Respondent's testimony as to the laws of New York State was in our opinion inadmissible. A bound volume of the laws of New York State including the appropriate stat-

ute, or a certified copy of the same, would be the best evidence thereof; See Henry's Pennsylvania Trial Evidence, sec. 242.

On August 1, 1934, petitioner came to the City of Corry, Pa., in this county, for the express purpose, according to his own testimony, of gaining a residence to enable him to obtain a divorce. The testimony of petitioner and of other witnesses is to the effect that he rented a room in Corry where he stayed over week-ends during the time that he was attempting to gain a residence for this purpose, that he carried his personal effects back and forth between Buffalo and Corry in a bag, and that he continued to work in Buffalo, N. Y.

The case was tried before the court and a jury and two questions submitted for their determination, as follows: (1) Had Oliver Tomlinson, plaintiff, been a bona fide resident of the City of Corry, Erie County, Pa., at least one whole year immediately previous to the filing of his petition or libel in this case? (2) Did Bertha Hoffman Tomlinson, defendant, procure the marriage by fraud, force, and coercion, and which has not been subsequently confirmed by the acts of the injured and innocent spouse? By the verdict of the jury these questions were answered in the affirmative. At the close of petitioner's testimony the attorney.for respondent moved for a compulsory nonsuit, which was refused. A motion for binding instructions on behalf of respondent was also refused. The matter is now before the court on respondent's motions for a new trial and for judgment n. o. v.

There are two methods in Pennsylvania of dissolving a contract of marriage, namely, by divorce and by annulment. There are several grounds upon which divorces may be decreed, one of them being fraud and coercion when it shall be adjudged that the other spouse:

"(g) Shall have procured the marriage by fraud, force, or coercion, and which has not been subsequently confirmed by the acts of the injured and innocent spouse":

Divorce Law of May 2, 1929, P. L. 1237, sec. 10, 23 P S §10.

Section 12 of the same act provides for the annulment of marriages upon one ground only, namely, bigamy:

"In all cases where a supposed or alleged marriage shall have been contracted, which is absolutely void by reason of one of the parties thereto having a spouse living at the time the supposed or alleged marriage, may, upon the application of either party, be declared null and void, in accord with the principles and forms hereinafter prescribed for cases of divorce from the bond of matrimony."

Prior to June 10, 1935, a bona fide residence in Pennsylvania for one full year prior to filing the libel or petition, both in actions for divorce and for annulment, was required. But this has been modified as to proceedings for annulment by the Act of June 10, 1935, P. L. 294, the pertinent part of which follows:

"Petitions or libels for the annulment of void or voidable marriages may be exhibited to the court of common pleas of the county where the marriage was contracted, or in the county where either the libellant or respondent resides, and, in such cases, residence of the libellant within the county or State, for any period shall not be required."

By the Act of July 15, 1935, P. L. 1013, section 12 of The Divorce Law of May 2, 1929, supra, is amended to read as follows:

"Annulment of Void Marriages.—In all cases where a supposed or alleged marriage shall have been contracted, which is absolutely void by reason of one of the parties thereto having a spouse living at the time the supposed or alleged marriage, or, if, for any other lawful reason, the said supposed or alleged marriage was absolutely void when contracted, such supposed or alleged marriage, may, upon the application of either party, be declared null and void, in accord with the principles and forms hereinafter prescribed for cases of divorce from the bond of matrimony."

It is urged on behalf of respondent that fraud and coercion, being one of the grounds provided for an action of divorce, cannot also be a ground for annulment, and that bigamy is the only ground upon which an annulment may be decreed in Pennsylvania. With this we cannot agree. Annulments may be decreed in Pennsylvania of incestuous marriages: McClain v. McClain, 40 Pa. Superior Ct. 248; and an annulment would probably be decreed because of false or fraudulent personation of either party: Allen's Appeal, 99 Pa 196, 200; and possibly for other causes.

Under the Act of July 15, 1935, quoted above, an action for annulment is not confined to bigamy but is extended to cases when "the said supposed or alleged marriage was absolutely void when contracted". This language does not in our opinion extend to or include such fraud as is alleged in the instant case, namely, false representations as to age and former marriage or divorce occurring prior to the date of the marriage sought to be annulled. Not all fraudulent representations will render a marriage contract "absolutely void." As was said by Mr. Justice Sharswood in Allen's Appeal, supra, at page 199:

"It is settled beyond all controversy, that fraud which would vitiate any other contract—even an executory contract to marry—will not have that effect when the marriage has actually been solemnized and consummated."

To come within the language of the statute the alleged fraud must go to the very essentials of the marriage, such, for example, as false personation or the actual pregnancy of the woman by another man. False representations as to age, former marriage, or divorce, or even as to chastity at the time of the marriage are not sufficient. In other words, the fraud here alleged, to wit, former marriage and divorce in New York State prior to the time of the marriage, even if proved would not render the marriage absolutely void, ab initio. This distinction is well

set forth in the opinion of Mr. Justice Sharswood in Allen's Appeal, supra, at pages 199-201:

"By the first section of the Act of May 8th 1854, Pamph. L. 644, it is provided that 'it shall be lawful for the courts of common pleas of this Commonwealth to grant divorce where the alleged marriage was procured by fraud, force or coercion.' By this language must of course be understood such fraud as would at common law render a marriage void. It is settled beyond all controversy, that fraud which would vitiate any other contract—even an executory contract to marry—will not have that effect when the marriage has actually been solemnized and consummated. 'It is well understood,' says Chancellor Kent, 'that error and even disingenuous representation, in respect to the qualities of one of the contracting parties in his condition, rank, fortune, manners and character, would be insufficient. The law makes no provision for the relief of a blind credulity, however it may have been produced:' 2 Kent's Comm. 77. It assumes that the party in entering into so solemn a contract—involving the most important duties and responsibilities for life, and upon which his happiness so much depends—has made all proper inquiries or is willing to take the other party upon trust without inquiry. According to the form of the marriage service of the Church of England, each party takes the other 'for better, for worse, for richer, for poorer, in sickness and in health, to love and to cherish till death them do part according to God's holy ordinance.' The fraud must be in what has been sometimes termed the *essentialia* of the contract. False personation by one of another person would undoubtedly be such a case. As to any other it will be found difficult, after looking through all the authorities, to lay down any rule which can sharply define and distinguish what are and what are not essentials. Every case must, to some extent, depend on its own circumstances. Thus it is well settled that want of chastity on the part of the woman — ante-nuptial incontinence — even though she

may have expressly represented herself as virtuous—forms no ground for avoiding the contract. Mr. Bishop, who has studied the subject with great care and research, in his valuable treatise on Marriage and Divorce, §179, considers, that on well-established principles, if the woman has even been a common prostitute, and has reformed her life, yet conceals her former misconduct, the marriage would still be good. The marriage contract is an express renunciation by her of all unlawful intercourse with others than her husband; and he makes a similar renunciation. According to the marriage service before referred to, they both solemnly promise, 'forsaking all others,' to keep themselves solely to each other. I consider this marriage service as good evidence of the ancient common law of England. This seems to be also the dictate of humanity and in conformity to the gospel which so strongly throughout inculcates the rule of mutual forgiveness. For otherwise, one of strong passions, led astray by them or seduced by the wicked arts of others, could have no hopes from reform. In such cases it is best for society that the past should be entirely buried in oblivion, and that the poor, erring creature should have the chance of a new life of respectability and honor. It is best that the other party should know, when the sin is afterward revealed to him, that it can do no good, but unmixed evil, to make it public by applying for a divorce. They must learn to submit to the inevitable. In this country—certainly in this state—adultery is a ground for divorce a vinculo matrimonii; so that if there should be a relapse after marriage, the marriage can be annulled. The only practical result, therefore, of declaring the marriage absolutely void, ab initio, for simple ante-nuptial incontinence—whether in one instance or many— would be to render innocent children illegitimate. And if ante-nutial incontinence be a sufficient ground of nullity as against the woman, it is not easy to see why it should not be so likewise against the man, and the consequences of such a doctrine it is not difficult to predict."

The testimony does not show a bona fide residence of petitioner for one year as required by law in Pennsylvania: Frazer v. Frazer, 71 Pa. Superior Ct. 382; Gearing, Jr., v. Gearing, 83 Pa. Superior Ct. 423; May v. May, 94 Pa. Superior Ct. 293. The marriage having been consummated in Pennsylvania and the action for annulment being brought here, such residence would not be necessary under the above-quoted section 15 of the Act of June 10, 1935, if this were a proper case for annulment. But, as we have already found, this is not such a case and the matter of the residence is therefore not of importance.

In our opinion, therefore, respondent's motions for a compulsory nonsuit and for a directed verdict should have been granted.

### Order

Now, to wit, March 30, 1937, the rule heretofore granted on respondent's motion for judgment n. o. v. is made absolute. The rule for a new trial is discharged.